# Indian Brewing Company's License.

*Liquor law—Brewing company—Application for license—Disqualification of applicant.*

1. Where an application for a liquor license is refused, and the court of quarter sessions files an opinion giving the grounds for refusal, the facts as found by the court below must be accepted as final by the appellate court, and it is only by reviewing the reasons given by the lower court that the appellate court can determine whether the license was refused on other grounds than those defined by statute.

2. The refusal of a license to a brewing company will be sustained on appeal where it appears that the reason for the refusal of the license was based on findings that the company had sold and distributed through its agents quantities of beer largely in excess of what the purchasers could possibly use for themselves and their families, and had thus promoted and made easy unlawful sales, not only to individuals, but as well, to crowds of persons, without regard to place or sale, age, sex or habit of the customer, and that, too, in a township where there had been no licenses to sell liquor by retail for forty years.

3. The controlling proof as to the unfitness of an applicant for a liquor license need not be of such degree and quantity as would justify a verdict of guilty if the applicant were on trial for a violation of the liquor laws. The forum is entirely different; in the one guilt must be established beyond a reasonable doubt; in the other the question is the good faith compliance by a licensee of a special privilege granted by the court.

Argued May 5, 1914. Appeal, No. 131, April T., 1914, by Indian Brewing Company, from order of Q. S. Indiana Co., Dec. T., 1913, No. 37, refusing a liquor license. Before RICE, P. J., ORLADY, HEAD, PORTER, HENDERSON, KEPHART and TREXLER, JJ. Affirmed.

Petition for license for a brewing company.

TELFORD, P. J., filed the following opinion:

The applicant in this case is a corporation, and its unfitness to receive a license has been alleged by remonstrance filed, charging that the applicant by its

directors, officers and agents, has been guilty of violations of the law in the conduct of its business, which violations of law indicate its unfitness to receive a license to engage in the manufacture and sale of intoxicating liquors.

The first charge alleges that it solicited orders for and delivered the products of the brewery in prohibited territory. At the hearing, evidence was submitted to the court which sustained the charge. In fact it was admitted by counsel and witnesses for the applicant that an agency was established at Strangford, a village in the township of Burrell, in this county, and that such agent solicited orders, collected the price and sent the same to the brewery. That the orders were there filled and delivered by the applicant to the Indiana Street Railway Co. to be by them carried to a point near Smith's Station and Smith's School House, in Burrell township. That at these points the beer was taken up by an employee of the brewery and delivered at the homes of customers in wagons marked with applicant's license number, furnished by it for this use.

From the brewery records in evidence, we are informed that between the dates of October 9 and November 6, 1913, 504 packages of beer and porter were sold and delivered in this prohibited territory through this agency.

An Act was passed in 1867, P. L. 291, extending the provisions of the Act of March 27, 1866, P. L. 339, to Burrell township.

This act provides as follows:

"That from and after the passage of this act, no license shall be issued to any person or persons to sell spirituous, vinous, malt or brewed liquors for drinking purposes, within the limits of the boroughs of Leechburg and Apollo, in the county of Armstrong, and the borough of Coudersport, in the county of Potter, and the borough of Saltsburg, in the county of Indiana, and the borough of Duncannon and Penn Township, in the county of Perry, or within two miles of the same, in the counties

in which said boroughs are located," which as we have stated, was extended by the act of March 27, 1867, "To the township of Derry, in the county of Westmoreland and the borough of Blairsville, the township of Burrell, and the township of East Mahoning, in the county of Indiana, provided that the two-mile clause shall not apply to Derry township, in the county of Westmoreland and East Mahoning township, in the county of Indiana."

The applicant, while admitting the fact, defends upon the following ground:

"That the act of 1891, under which the Brewery holds and applies for license, is general in its terms and permits the brewing company to deliver its product in Indiana County, and consequently in Burrell township; and this is not in conflict with the special act for Burrell township, as the Indian Brewing Company makes all its sales at its brewery in Indiana borough."

This position is not tenable. If the only act done by the brewing company was the filling of the orders as it came to it, and delivering the packages to a common carrier, it might be claimed that the sale was completed at the brewery, but when the applicant established an agency to take orders, collect money and remit the orders and money to the brewery, and when it had shipped goods billed to an employee by trolley freight into the prohibited territory and by their employee there again take up the packages within a prohibited territory and deliver them to the purchasers in that territory, the place of delivery is the place of sale.

The control of the brewery over the goods so delivered was surrendered only upon its delivery to the party who had ordered the product. So long as these prohibitory acts remain upon the statute books, the court has no power to grant licenses for the sale of intoxicating liquors therein, and the licensee is bound to take notice that such territory has been withdrawn from the operation of the license law.

We can only view this act of the applicant as evidence of its unfitness.

The same charge was made and supported by evidence at a former hearing, when license was refused. The township has been long since established; its boundaries are well known by many people, and if unknown to the officers of the applicant, the information might have been readily acquired upon inquiry.

The second charge alleges: "That the applicant has made sales of intoxicating liquors to unlicensed persons in quantities beyond that possible for private consumption, thus knowingly encouraging the maintenance of speakeasies."

In support of this allegation, the order sheets of the applicant company were produced covering shipments for about two months, to three of its agencies, and about nine months to a fourth agency. In glancing through this evidence, we find more than 120 shipments, of from twenty to eighty pieces each, in eighths of cases on individual orders. The size and frequency of these individual orders invites investigation. For instance, there was delivered to A. Collisino, at Ernest, on November 6, 1913, twenty pieces; on the following day, November 7, twenty pieces, on the 13th, thirty pieces, on the 14th, twenty pieces, and on the 17th, forty pieces. To T. Collisino, at Ernest, November 21, twenty-five pieces, November 27, thirty pieces, on December 1, thirty pieces, and on December 4, thirty pieces.

It is unreasonable to contend that this beer was for the personal use of the party who ordered it. If it was disposed of to boarders as the applicant contends, it could not be done legally, unless as a gratuity.

Other shipments in large quantities appear to have been made beyond that which could be used for individual consumption. Testimony was further offered to show that in two instances speakeasies had been supplied with beer. These speakeasies located in the bor-

ough of Creekside, appear from the evidence to have been well known as such, and well patronized.

The manager of the brewery denies knowledge of their existence, but the testimony of Mr. Biamonti, agent for that territory, was not presented.

The remonstrant further presented evidence that 100 or more cases or kegs of beer had been delivered to a society at Ernest, and the evidence further establishes the fact that this beer was sold. No effective investigation was made to ascertain the uses to be made of this large delivery.

We further learn from the testimony of the president of the brewery, L. F. Sutter, that the applicant furnishes for weddings and christenings beer in quantities of from fifty to seventy-five pieces. He testifies as follows:

"Q. What is your practice as to supplying beer for weddings and christenings; is there any limit, and if so, how much? A. Yes, sir. Q. What is your limit? A. We have on some occasions gotten together with the superintendent and fixed the limit for christenings and weddings. Q. When did you fix a limit for christenings or weddings? A. A long time ago. I think it was one or two years ago. Q. What was the limit fixed? A. I can't recollect the amount we did fix; in one town the limit is seventy-five pieces for a wedding and fifty for a christening. Q. You have different amounts for different places? A. We always carry out the request of the superintendent at those places. If it was ten pieces and five, it would be carried out. Q. Then you are governed in that by the superintendent of the works? A. Yes, sir. The fact of the matter is we might say we are governed by any report that comes to us along the lines."

The custom at such weddings and christenings amongst the foreign population is well known, and the contributions of guests and the hospitable privileges that are extended in consideration therefor, constitute a palpable evasion of the license laws.

The president of the brewing company, when upon the witness stand, further stated upon examination as follows:

"Q. What is your idea of the largest shipment that should be made to a private individual for his private use, a week? A. It would depend on the amount of people he would have in his house. There are houses among these foreigners, where I have made inquiry to find out about these shipments, and I found as high as twenty-one boarders in one house. I would say that as far as figures are concerned, and the use they make of it, that twenty-one boarders and the family besides, could possibly get away with 100 pieces a week, and possibly not be a bit drunk, or be any drunkenness about the house. They use it with their meals and all the time. Q. Do you, as manager of the brewery, permit as much as 100 pieces to be shipped to a particular individual? A. No, not that I ever knew of. Q. What would you say as to your list about the amount shipped to a particular individual? A. I would say it would be about forty or fifty pieces; that would be extreme. That would be an exception to permit that much to be shipped to a particular individual."

Our experience has led us to be fairly well informed about the method employed by breweries generally, in the distribution of their product. We had hoped that this brewery would be conducted in such a way as to do the least possible injury to the public, and whilst we believe that the practices here are less injurious to the community than those common to some other jurisdictions, yet we feel that the standard which this applicant has adopted and under which it operates, is below that required by the law, and has been most injurious to the community.

On December 19, 1913, preceding the filing of this application for license, the Indian Brewing Company, filed to No. 25, December Sessions, 1912, in the court of common pleas, a list of its agents, twenty-seven in

number, all of whom with perhaps three exceptions, bear foreign names. The placing of the soliciting for orders and the delivery of the brewery products so largely in the hands of foreigners, so many of whom are unacquainted with our laws, and so little disposed to encourage moderation in distribution, must lead to frequent infractions of the law.

It also appears that from an inspection of the application, that no affidavit has been filed as required by the Act of July 30, 1897, P. L. 464, sec. 1.

Now, February 16, 1914, for reasons indicated in the foregoing opinion, this application is refused.

On a motion for a rehearing TELFORD, P. J., filed the following opinion:

The applicant has filed with the court its petition for a rehearing and reconsideration of its application.

As to the question of a rehearing, it is not proposed to present any additional evidence and hence a rehearing would not aid us.

As to a reconsideration, with the petition before us, we have again gone over the case as presented. We have done this, not because in doubt as to the correctness of our conclusions, which led to a refusal of the license, but because we were impressed with the burden of discomfort entailed upon individuals, employees and others as a result of that order, and the fear that greater injury to the public might result through its procuring its supply from sources without the county, instead of at a local brewery, and we have considered in this connection, the proposition of the applicant to comply with such "reasonable" regulations as the court may make.

We are in full sympathy with some of these men who have lost their employment entailing discomfort to them and their families, and if our duty to the public, as we view it, would permit us to continue them in their employment by a continuance of the license, we would do so.

In refusing this license we overlooked the affidavit

on file stating the number of barrels brewed during the preceding year. The reference to the omission was not as a reason for refusing the license, since the information could have been otherwise supplied. We now note the fact that the amount brewed is stated to have been about 45,000 barrels during the preceding year.

When we consider that this brewery is not the only source of our supply, this amount seems large and confirms us in our opinion that no proper effort was made to confine distribution to the legitimate trade.

At first the proposition of the applicant to submit to such "reasonable" rules and regulations as the court may adopt appealed to us.

With the view, however, which the management holds with reference to the legal distribution and which is forcibly urged upon us by the petition for reconsideration, we doubt whether such restrictions as the court might make, would be regarded as "reasonable" by the applicant.

We have endeavored to do our duty as we saw it, in the disposition of the application in license court.

The business is peculiar and cannot be measured by comparison with any other trades. It does not yield easily to the restraints which the law imposes and less readily to rules and regulations of the court.

The suggestion of the applicant would place upon the court, a responsibility which it cannot assume.

Now, February 24, 1914, the petition for a reconsideration of the order refusing a license to the Indian Brewing Company, is refused.

*Error assigned* was the order of the court.

*Harry White*, with him *Geo. J. Feit*, for appellant.— Where the court sets forth on record as part of its decree the reasons for its action, the appellate court has authority to look into the case for the purpose of ascertaining whether the reasons thus assigned are legal

reasons: Doberneck's App., 1 Pa. Superior Ct. 637; Donoghue's License, 5 Pa. Superior Ct. 1.

The only method of establishing the unfitness of a corporation is to show that in the conduct or management of its business it has been guilty of violating the law: Indian Brewing Company's License, 226 Pa. 56.

Then it is not unlawful for a citizen to purchase beer or other liquor for consumption in his own house by his family, or invited guests. And, indeed, in his own house on Sunday: Com. v. Cary, 151 Pa. 368.

*John H. Pierce,* for appellee.—The unfitness of the applicant is a legal reason under the above act of assembly for the refusal of this license and also under the decisions of the Supreme and Superior Courts: Mead's License, 161 Pa. 375; Gemas's App., 169 Pa. 43.

There having therefore been a judicial hearing and the license having been refused for a legal reason the appellate court will not discuss the correctness of the result reached by the court below: Gemas's App., 169 Pa. 43; Doberneck's App., 1 Pa. Superior Ct. 99; Brown's App., 2 Pa. Superior Ct. 63.

The appellate court cannot discuss the merits, but only whether the license court proceeded according to law. When a license has been refused, after a hearing, the presumption on appeal is that the refusal was for a legal reason unless the contrary affirmatively appear: Free's License, 33 Pa. Superior Ct. 348; Sweeney's License, 11 Pa. Superior Ct. 569.

No distinction is made in the act under which this application for license was made between natural and artificial persons: Pittsburg Brewing Company's License, 12 Pa. Superior Ct. 129; Indian Brewing Company's License, 40 Pa. Superior Ct. 72.

OPINION BY ORLADY, J., July 15, 1914:

This applicant for a brewer's license is a domestic corporation, and the remonstrance filed set out, that it

"is not a fit person or corporation to be granted such a license, it having been guilty of the following violations of law in the conduct of its business:

"First—The applicant has solicited orders for and delivered intoxicating liquors in a township having special prohibitory laws.

"Second—The applicant has made sales of intoxicating liquors to unlicensed persons in quantities beyond that possible for private consumption, thus knowingly encouraging the maintenance of speak-easies.

"Third—The applicant has made sales of intoxicating liquors to men of intemperate habits.

"Fourth—The applicant has made deliveries of its products in wagons not marked according to law."

An open hearing was had, at which a large number of witnesses on behalf of the applicant and remonstrants were heard, and after due consideration, a lengthy opinion was filed in which the important facts are stated and a final order made, as follows: "For reasons indicated in the foregoing opinion this application is refused." The order, and the reasons given in the opinion are assigned for error: the question involved is stated to be, viz.: "Whether the facts set forth in the opinion, or any of them constituted violations of the law; whether the refusal of the license applied for was an abuse of discretion."

The evidence is not before us, for the appeal brings up nothing but the record: Indian Brewing Company's License, 40 Pa. Superior Ct. 74, and cases therein cited.

The facts as found by the court below, as they are given in the opinion, must be accepted as final, and it is but proper to say, that they are not challenged by the applicant. The reasons given in the opinion and the order made are so joined that they must be considered together. It is only by reviewing the reasons that the appellate court can determine whether the lower court has acted on other grounds than those defined by the statute: Donoghue's License, 5 Pa. Superior Ct. 1; Netter's

License, 11 Pa. Superior Ct. 566; Brown's License, 18 Pa. Superior Ct. 409.

It is conceded that the controlling question before the court below was, "Did the facts, as found, justify the court in the exercise of its discretion in concluding that this applicant was not a fit corporation to receive a brewer's license for another year?" This issue was clearly defined, as the petitioners averred that the brewing company was a fit person or corporation to have the license, and the remonstrants averred directly the contrary.

The product of the brewery for the preceding year was 45,000 barrels. The system of marketing this was, in part at least, shown by a list of its twenty-seven sales agents—twenty-four of whom bear names of foreign birth, whose duty it was to solicit orders for the brewery from persons, many of whom were foreigners, Slavs—Italians—and French—who were laborers in the bituminous coal mines and industrial plants in the county. Under rules fixed by the applicant, these agents solicited orders, which were signed by the buyer, and collected the price, remitted the orders and money to the brewery, when the beer would be billed to the purchaser and shipped to the agent for delivery by the company's wagon, or direct to the purchaser by common carrier. The propriety of the order of the court does not turn on the legality of this procedure. The court found from the order sheets produced by the company's officers, that 120 shipments of from twenty to eighty pieces (in one-eighth barrel or cases) had been delivered within one month on the individual order of one person. The company's officials had decided, that 100 pieces a week for a house with twenty boarders would not be excessive; that shipments to be used at a wedding should be limited to seventy-five pieces, and for a christening to fifty pieces.

The judge who refused this license resides in the county and is familiar with its industries and popula-

tion. He states: "The custom at such weddings and christenings amongst the foreign population is well known, and the contributions of guests and the hospitable privileges that are extended in consideration thereof, make such deliveries a palpable evasion of the license laws."

He further finds, that 504 packages of beer and porter were sold and delivered in a township which for nearly forty years has been prohibited territory for such sales, by license within its limits, and that speak-easy proprietors, societies, picnics, festivals, etc., were furnished with beer from this applicant's brewery in quantities determined by their managers and patrons. Such places and meetings were well known in the neighborhood to be unlicensed and to attract great numbers of people.

It is earnestly urged that such sales are justified by the opinion of the Supreme Court in Indian Brewing Company's License, 226 Pa. 56, in which it is said, "The only method of establishing the unfitness of a corporation is to show that in the conduct or management of its business it has been guilty of violating the law. It is clear, therefore, that in the hearing of such an application numerously signed petitions or remonstrances by persons without knowledge of any unlawful act or acts having been committed should have no weight in determining whether the applicant had been guilty of violating the law," and contend that the sale to a speakeasy proprietor or conductor of a picnic or festival is not an unlawful one. We do not interpret the decision in that case as meaning, that the controlling proof as to the unfitness of the applicant in a license hearing, must be of such degree and quantity as to justify a verdict of guilty on a trial of the applicant in the quarter sessions, before it is available by the license judge in determining the unfitness of the applicant. The forum is entirely different, in the one guilt must be established beyond a reasonable doubt, in the other the question

is the good faith compliance by a licensee of a special privilege granted by the court. The license is not a demandable right, and is issued only when the applicant is found to be a fit person or corporation, and after a strict compliance with all the statutory requirements. The fitness of the applicant is just as important a qualification as any other requisite, and there is no legal standard given for determining that condition. Very much must be left to the judicial discretion of the license judge who is familiar, by reason of his situation, with the common business methods of the applicant, whether an individual or a corporation: Gemas's License, 169 Pa. 43. While a corporation has no personal attributes, it must be judged by its corporate acts, as stated in Indian Brewing Company's License, 226 Pa. 60, "Of course, a corporation made fit by the act of incorporation to engage in the manufacture and sale of liquor may become unfit within the meaning of the license laws by corporate acts committed in violation of law by its directors, officers and authorized agents. In this sense the fitness of a corporation presenting an application for a license may be inquired into, when unlawful acts such as selling on Sunday, or to minors or to persons of known intemperate habits, or other violations of the law, are relied on to defeat the application, and the evidence whether presented in a remonstrance or produced at a hearing must establish to the satisfaction of the court the unlawful acts complained of." This does not require that the guilt of the applicant shall be first established by a verdict, before the license judge may take cognizance of improper and pernicious methods in conducting the business. The general conduct and management of its business furnishes a fair gauge to ascertain its conception of duty, and responsibility in exercising its license privilege. The court has the right to expect of its licensee, that absolute good faith will be exercised in not encouraging or facilitating violations of the law. Legislative enactment and judicial deci-

sions have been so frequently invoked within the last decade, that such an applicant must appreciate the fact, that a license to sell liquor is for a specially hazardous enterprise, and that all enactments and decisions strongly tend to a more severe legal supervision of the business, so as to regulate and restrain such sales, rather than to have them conducted along general business lines. A brewer may not·be bound to follow his product to see that no unlawful use is made of it, nor is soliciting orders by agents unlawful. The pertinent question, however, is in regard to the general method adopted by the company in making its sales. There is no reason in our law for fixing a different rule on this phase of the question in determining the fitness or unfitness of a corporation in such a case from the ones universally applied to an individual. The proof required is necessarily different, but the result ascertained from that proof is the same in one case as in the other. Each seeks a privilege to conduct a business, and the manner of arranging that business furnishes the best evidence of its design to prevent or encourage illegal sales of liquor, by keeping strictly within, not only the letter but the spirit of the law.

The court, in its opinion, found that "the standard which the applicant had adopted and under which it operates its business is below that required by the law and has been most injurious to the community." The method adopted clearly shows that such large quantities of beer were distributed by its agents that it would reasonably and naturally be within the reach of many persons to whom sales could not be made lawfully. These distributions, called by any name that may be suggested, were largely within the control of the applicant, they were encouraged and facilitated by the agents who acted under direct instructions from their employer, and they promoted and made easy unlawful sales, not only to individuals, but, as well, to crowds of persons, without regard to place of sale, age,

sex or habit of the consumer. There is nothing in this record to convince us that the license judge abused the judicial discretion vested in him in refusing the license.

The order is affirmed.